**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CEDAR RAPIDS DIVISION**

PSK, LLC d/b/a OVERHEAD DOOR
COMPANY OF CEDAR RAPIDS AND
IOWA CITY,

        Plaintiff,

vs.

RANDY HICKLIN d/b/a A-1
AMERICAN GARAGE DOOR
REPAIR, ADVANCED GARAGE
DOOR REPAIR, and/or OVER HEAD
AAA GARAGE DOOR REPAIR; and
DANETTA HICKLIN, d/b/a A-1
AMERICAN GARAGE DOOR
REPAIR, ADVANCED GARAGE
DOOR REPAIR, OVER HEAD AAA
GARAGE DOOR REPAIR,
AFFORDABLE OVERHEAD GARAGE
DOOR REPAIR and AMERICAN
CERTIFIED DOOR CO.,

        Defendants.

No. 09-CV-105-LRR

**ORDER**

_____

*TABLE OF CONTENTS*

I.     **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

II.    **PROCEDURAL BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

III.   **SUBJECT MATTER JURISDICTION** . . . . . . . . . . . . . . . . . . . . . . . . **4**

IV.   **SUMMARY JUDGMENT STANDARD** . . . . . . . . . . . . . . . . . . . . . . . **4**

V.    **EVIDENTIARY ISSUES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**

        A.    *Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**
        B.    *Plaintiff's Motion to Strike* . . . . . . . . . . . . . . . . . . . . . . . . . . **9**
             1.    *The e-mails* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **9**

        **2.**     *Telephone directory excerpts* . . . . . . . . . . . . . . . . . . . . . **9**

**C.**     *The Hicklins' Motion to Strike* . . . . . . . . . . . . . . . . . . . . . . . **10**

**D.**     *The Hicklins' Objections and Appeal* . . . . . . . . . . . . . . . . . . . . **10**

**VI.**    **FACTUAL BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **10**

**A.**     *Overhead Door Corporation* . . . . . . . . . . . . . . . . . . . . . . . . **10**

**B.**     *Overhead Door Company of Cedar Rapids and Iowa City* . . . . . . . **11**

**C.**     *Plaintiff's Advertising* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **11**

**D.**     *Use of the Term "Overhead"* . . . . . . . . . . . . . . . . . . . . . . . **12**

**E.**     *The Hicklins* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **13**

**F.**     *The Hicklins' Advertisements* . . . . . . . . . . . . . . . . . . . . . . . **13**

**G.**     *The Hicklins Encounter Confusion* . . . . . . . . . . . . . . . . . . . . **16**

**H.**     *Customer Exeriences* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **17**

        **1.**     *Greg Allen* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **17**

        **2.**     *Jack McArtor* . . . . . . . . . . . . . . . . . . . . . . . . . . . **19**

        **3.**     *Shari Saari* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **20**

        **4.**     *Jeffrey DeFrance* . . . . . . . . . . . . . . . . . . . . . . . . **22**

        **5.**     *Linda Norton* . . . . . . . . . . . . . . . . . . . . . . . . . . **23**

        **6.**     *Karen Guse* . . . . . . . . . . . . . . . . . . . . . . . . . . . **24**

**I.**     *The Magid Survey* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **25**

**J.**     *The Hicklins' "Certified" Technicians* . . . . . . . . . . . . . . . . . . **25**

**VII.**   **ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **26**

**A.**     *Infringement Claims* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **26**

        **1.**     *Strength of a mark* . . . . . . . . . . . . . . . . . . . . . . . **27**

        **2.**     *"Overhead" is a generic term* . . . . . . . . . . . . . . . . . **27**

        **3.**     *Likelihood of confusion* . . . . . . . . . . . . . . . . . . . . **34**

**B.**     *Lanham Act Unfair Competition Claims* . . . . . . . . . . . . . . . . **34**

        **1.**     *Passing off* . . . . . . . . . . . . . . . . . . . . . . . . . . . **35**

            *a.*     *Legal background* . . . . . . . . . . . . . . . . . . . **35**

            *b.*     *Secondary meaning* . . . . . . . . . . . . . . . . . . **38**

            *c.*     *Likelihood of confusion* . . . . . . . . . . . . . . . . **41**

                *i.*     *Strength of Plaintiff's mark* . . . . . . . . . **42**

                *ii.*    *Similarity between the parties' marks* . . . . . . **42**

                *iii.*   *Competitive proximity of the parties' products* . . **45**

                *iv.*   *The Hicklins' intent to confuse* . . . . . . . . . . **45**

                *v.*    *Evidence of actual confusion* . . . . . . . . . . . **47**

                *vi.*   *Potential customers' degree of care* . . . . . . . . **48**

            *d.*     *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . **49**

        *2.     False advertising* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **50**
  **C.     *Iowa Code Section 548.113*** . . . . . . . . . . . . . . . . . . . . . . . . **52**

**VIII.  CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **54**

## *I.  INTRODUCTION*

The matters before the court are: (1) the "Motion for Summary Judgment" (docket no. 68), filed by Defendants Randy Hicklin and Danetta Hicklin (together, the "Hicklins"); (2) Plaintiff PSK, LLC's "Motion to Strike" (docket no. 70); (3) the Hicklins' "Motion to Strike Plaintiff's Exhibit 30" ("Hicklins' Motion to Strike") (docket no. 90); and (4) the Hicklins' "Objections and Appeal of 9/22/2010 Ruling on Motion for Clarification - Reconsideration" ("Objections and Appeal") (docket no. 98) (collectively, the "Motions").

## *II.  PROCEDURAL BACKGROUND*[1]

On August 5, 2009, Plaintiff filed a five-count Complaint (docket no. 1) against Hicklin Overhead Doors, Inc.  Plaintiff asserted claims for common law service mark infringement, common law trade name infringement, service mark infringement and unfair competition in violation of Lanham Act § 43(a), false descriptions in violation of Lanham Act § 43(a) and injury to business reputation in violation of Iowa Code section 548.113. On August 26, 2009, Plaintiff filed an Amended Complaint (docket no. 5) to add Randy Hicklin as a defendant.  Plaintiff's claims remained the same.

On September 29, 2009, Randy Hicklin filed an Answer (docket no. 11) denying the substance of the Amended Complaint.  On October 13, 2009, Hicklin Overhead Doors, Inc. filed an Answer (docket no. 14) denying the substance of the Amended Complaint.

On October 22, 2009, Plaintiff filed a Second Amended Complaint (docket no. 22) to add Danetta Hicklin as a defendant.  On October 26, 2009, Hicklin Overhead Doors,

---

[1] The court recites here only the procedural background pertinent to the Motion for Summary Judgment.  Additional procedural background relevant to the parties' evidentiary disputes is set forth below in Section V.A.

Inc. filed an Answer (docket no. 24) denying the substance of the Second Amended Complaint. On November 13, 2009, the Hicklins filed an Answer (docket no. 26) denying the substance of the Second Amended Complaint.

On April 8, 2010, Plaintiff stipulated to Hicklin Overhead Doors, Inc.'s dismissal from the instant action. On May 4, 2010, the Hicklins filed an Amended Answer (docket no. 32), in which they asserted additional affirmative defenses.

On August 16, 2010, the Hicklins filed the Motion for Summary Judgment. On September 10, 2010, Plaintiff filed a Resistance (docket no. 71). On September 20, 2010, the Hicklins filed a Reply (docket no. 89).

The parties request oral argument on the Motion for Summary Judgment. However, the court finds that oral argument is unnecessary. The Motion for Summary Judgment is fully submitted and ready for decision.

## III. SUBJECT MATTER JURISDICTION

The court has federal question jurisdiction over Plaintiff's claims arising under the Lanham Act, 15 U.S.C. § 1051 *et seq*. *See* 28 U.S.C. § 1331; 28 U.S.C. 1338(a). The court has supplemental jurisdiction over Plaintiff's state law claims because they are so related to Plaintiff's federal claims that they "form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. 1367(a).

## IV. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "An issue of fact is genuine when 'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is material when it "might affect the outcome of the suit under the governing law."

*Anderson*, 477 U.S. at 248.  "[T]o establish the existence of a genuine issue of material fact, 'a plaintiff may not merely point to unsupported self-serving allegations.'"  *Anda v. Wickes Furniture Co.*, 517 F.3d 526, 531 (8th Cir. 2008) (quoting *Bass v. SBC Commc'ns, Inc.*, 418 F.3d 870, 872 (8th Cir. 2005)).  Rather, the nonmoving party "'must substantiate [its] allegations with sufficient probative evidence that would permit a finding in [its] favor.'"  *Anda*, 517 F.3d at 531 (quoting *Bass*, 418 F.3d at 873).  The court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences.  *Baer Gallery, Inc. v. Citizen's Scholarship Found. of Am., Inc.*, 450 F.3d 816, 820 (8th Cir. 2006) (citing *Drake ex rel. Cotton v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006)).

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue."  *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, "set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2); *see, e.g.*, *Baum v. Helget Gas Prods., Inc.*, 440 F.3d 1019, 1022 (8th Cir. 2006) ("Summary judgment is not appropriate if the non-moving party can set forth specific facts, by affidavit, deposition, or other evidence, showing a genuine issue for trial.").  The nonmoving party must offer proof "such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  "'Evidence, not contentions, avoids summary judgment.'"  *Reasonover v. St. Louis County, Mo.*, 447 F.3d 569, 578 (8th Cir. 2006) (quoting *Mayer v. Nextel W. Corp.*, 318 F.3d 803, 809 (8th Cir. 2003)).

## V.  EVIDENTIARY ISSUES

The parties raise a host of evidentiary issues.  The court addresses them here,

before turning to the merits of the Motion for Summary Judgment.

## A. *Procedural background*

On September 10, 2010, Plaintiff filed its Motion to Strike, seeking to strike two categories of evidence that the Hicklins submitted in support of the Motion for Summary Judgment. First, Plaintiff sought to strike several e-mails[2] that Overhead Door Corporation representatives purportedly sent to Plaintiff's owner and manager. Plaintiff argued that the e-mails lack foundation and constitute hearsay. Plaintiff also moves to strike the Hicklins' Exhibits 24-31, which are purported excerpts from telephone directories in various cities. *See* Hicklins' App'x at 121-82. Plaintiff argues that "the Hicklins have made no attempt to authenticate the exhibits." Plaintiff's Motion to Strike at ¶ 2.b.

In response to Plaintiff's Motion to Strike, the Hicklins issued a subpoena to Overhead Door Corporation. The Hicklins sought to depose one or more Overhead Door Corporation representatives, seeking to elicit testimony it presumably could use to authenticate the e-mails.

On September 16, 2010, Plaintiff filed a "Motion to Quash Subpoena and/or Enforce Scheduling Order Deadlines" ("Motion to Quash") (docket no. 82). In the Motion to Quash, Plaintiff argued that the discovery deadline expired on July 16, 2010, and that the Hicklins did not establish good cause to modify the Scheduling Order (docket no. 16) deadlines. That same date, the Hicklins filed a "Resistance to Motion to Quash" (docket no. 83), in which they argued that Plaintiff, having previously sought to avoid discovery of the e-mails on grounds of attorney-client privilege, should not be allowed to raise authenticity and foundation objections to the e-mails. Accordingly, the Hicklins asked the court to deny the Motion to Quash and "declare that the authenticity and foundation have

_____

[2] The e-mails appear in the Hicklins' Exhibit 9. *See* Hicklin's Appendix ("Hicklins' App'x") (docket nos. 68-4 through 68-27) at 37-39.2.

already been established, or in the alternative allow the deposition to go forward." Resistance to Motion to Quash at ¶ 2.

On September 16, 2010, United States Magistrate Judge Jon S. Scoles entered an Order (docket no. 84) denying the Motion to Quash. Judge Scoles noted that, during the earlier discovery dispute involving the e-mails, "Plaintiff never questioned the authenticity of the e-mails." Order at 2. Accordingly, Judge Scoles found that the Hicklins "should be permitted to take the depositions of [two Overhead Door Corporation representatives] for the limited purpose of establishing that they are the authors of the e-mails . . . ." *Id.* However, Judge Scoles ordered that the Hicklins "may not question the witnesses regarding the substance of the e-mails or the opinions found therein." *Id.*

On September 17, 2010, Plaintiff filed a "Partial Withdrawal of Motion to Strike" (docket no. 85), in which it withdrew its authenticity objections to the e-mails. However, Plaintiff maintains that the e-mails constitute inadmissible hearsay. That same date, the Hicklins filed a "Motion for Clarification/Reconsideration of September 16, 2010 Order ("Motion for Clarification/Reconsideration") (docket no. 86). In the Motion for Clarification/Reconsideration, the Hicklins sought clarification as to whether Judge Scoles's September 16, 2010 Order would allow them to take a "foundational deposition" apparently related to whether the e-mails fall within the business records exception to the hearsay rule. Motion for Clarification/Reconsideration at ¶ 4.

On September 20, 2010, Plaintiff filed a Resistance (docket no. 88) to the Motion for Clarification/Reconsideration. Plaintiff argued that the Hicklins sought to expand Judge Scoles's Order "to let them conduct significant discovery in hopes they can shoehorn the emails into the business records exception to the hearsay rule." Resistance at 2.

That same date, the Hicklins filed their Motion to Strike, in which they ask the court

to strike the expert witness report prepared by Frank N. Magid Associates.[3]  The Hicklins argue that the report, which Plaintiff submitted in support of its Resistance to the Motion for Summary Judgment, is irrelevant.

On September 22, 2010, Judge Scoles entered an Order (docket no. 94) denying the Motion for Clarification/Reconsideration.  As opposed to the authentication issues, Judge Scoles found that Plaintiff never "made any representations regarding whether the e-mails were 'kept in the course of a regularly conduct business activity,' and thereby fall within the business records exception to the hearsay rule."  Order at 3.  Judge Scoles held that "the Hicklins have not shown good cause for an extension of the discovery deadline established in the Scheduling Order."  *Id.*  Therefore, Judge Scoles denied the Hicklins' request "to take the deposition of an Overhead Door Corporation representative to establish additional 'foundation' for the business records exception . . . ."  *Id.*

On September 27, 2010, the Hicklins filed a "Resistance to Plaintiff's Motion to Strike and Request for Oral Hearing" (docket no. 95).  Plaintiff has not filed a resistance to the Hicklins' Motion to Strike and the time for doing so has expired.

On October 4, 2010, the Hicklins filed the Objections and Appeal.  In the Objections and Appeal, the Hicklins argue that, in the event it "does not accept" the arguments in opposition to Plaintiff's Motion to Strike, the court should review Judge Scoles's Order on the Motion for Clarification/Reconsideration and "allow the corporate deposition of Overhead Door Corporation to proceed . . . ."  Objections and Appeal at 4.

On October 5, 2010, Plaintiff filed a "Reply in Support of Motion to Strike" (docket no. 99).  On October 12, 2010, Plaintiff filed a "Resistance to [the Hicklins'] Objections and Appeal" (docket no. 100).

---

[3] The expert report appears at pages 168-78 of Plaintiff's Appendix ("Pl. App'x") (docket nos. 71-3 through 71-15).

### B. Plaintiff's Motion to Strike

As previously noted, Plaintiff asks the court to strike several emails as inadmissible hearsay. Plaintiff also seeks to strike excerpts from various telephone directories on authentication grounds.

#### 1. The e-mails

The court finds that it is not necessary to consider the e-mails at issue for purposes of ruling on the Motion for Summary Judgment.[4] Accordingly, the court shall deny this portion of Plaintiff's Motion to Strike as moot.

#### 2. Telephone directory excerpts

With their Resistance to Plaintiff's Motion to Strike, the Hicklins submitted an affidavit from their counsel stating that the telephone directory excerpts contained in the Hicklins' Exhibits 24-29 are "true and correct copies from Dex directories" that the Hicklins' counsel "personally downloaded" from the DexPages.com website. Affidavit of Laura N. Martino ("Martino Aff.") (docket no. 95-3) at ¶ 3. With respect to the Hicklins' Exhibits 30-31, the Hicklins' counsel avers that they are "true and correct copies taken from Yellowbook directories located in the offices of [the Hicklins' counsel]." *Id.* at ¶ 4.

It is unclear whether, in light of this affidavit, Plaintiff continues to challenge the authenticity of the excerpts. In Plaintiff's Reply in Support of its Motion to Strike, Plaintiff does not mention the telephone directory excerpts, much less argue that they still have not been authenticated. In any event, the court finds that the excerpts are properly

---

[4] The Hicklins offer the e-mails to establish that Plaintiff has no protectible interest in the term "overhead" for purposes of Plaintiff's infringement claims. As explained below, the court finds—without considering the substance of the e-mails—that the term "overhead" is generic and therefore Plaintiff has no protectible interest in the word. The e-mails have no relevance to the issues underlying Plaintiff's unfair competition claims. Accordingly, the court's decision to not consider the e-mails has no bearing on those claims.

authenticated.[5]  *See* Fed. R. Evid. 901(a) ("The requirement of authentication . . . is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.").  Accordingly, the court shall deny Plaintiff's Motion to Strike to the extent it seeks to strike the excerpts of telephone directories contained in the Hicklins' Exhibits 24 through 31.

### C. The Hicklins' Motion to Strike

In their Motion to Strike, the Hicklins ask the court to strike a consumer survey conducted by Frank N. Magid Associates ("Magid Survey"), which Plaintiff submitted in support of the Resistance.  *See* Pl. App'x at 168-178.  The court declines to strike the Magid Survey.  However, for the reasons explained in Section VII.B.1.b., *infra*, the court agrees with the Hicklins that the Magid Survey is irrelevant on the issue of secondary meaning.

### D. The Hicklins' Objections and Appeal

As explained above, the court finds it is unnecessary to consider the e-mails Plaintiff challenges in its Motion to Strike.  Because the Hicklins' Objections and Appeal pertain solely to this issue, the court finds that oral argument on the Objections and Appeal is unnecessary and the court shall deny the Objections and Appeal as moot.

## VI.  FACTUAL BACKGROUND

Viewing the facts in the light most favorable to Plaintiff, and affording it all reasonable inferences, the undisputed facts are as follows.

### A. Overhead Door Corporation

Overhead Door Corporation manufactures garage doors and related products.  Overhead Door Corporation's registered trademarks include a "red ribbon" logo, which

---

[5] The court also notes that Plaintiff authenticated telephone directory excerpts in this manner.  *See* Pl. App'x at 101-02 (averring that the excerpts are "true and correct copies taken from Yellowbook and DEX directories").

features the phrase "OVERHEAD DOOR." *See* Hicklins' App'x at 103 (depicting portion of Overhead Door Corporation website, including "red ribbon"). Overhead Door Corporation refers to its authorized distributors as "Ribbon Distributors." *Id.*

## B. Overhead Door Company of Cedar Rapids and Iowa City

Overhead Door Corporation has had an authorized distributor in the Cedar Rapids and Iowa City, Iowa area since 1956. Jeff Fauchier, the father of Plaintiff's current manager, Martin Fauchier, originally operated the distributorship in this region. Plaintiff's primary shareholder, Deric Powell, purchased the business in 2004, and does business as "Overhead Door Company of Cedar Rapids and Iowa City."

Plaintiff is in the business of "selling and servicing garage doors in both the commercial and residential markets." Hicklins' Statement of Material Facts ("Hicklins' Statement of Facts") (docket no. 68-2) at ¶ 5. In February of 2004, Plaintiff became an authorized distributor of Overhead Door Corporation's products. Pursuant to its distributor agreement, Plaintiff is authorized to distribute Overhead Door Corporation's products and use Overhead Door Corporation's marks within Plaintiff's distribution area.[6] Since 2007, Plaintiff has generated substantial revenue through residential sales and service. *See* Pl. App'x at 24.

## C. Plaintiff's Advertising

Since acquiring the business in 2004, Plaintiff has engaged in marketing and advertising through several media, including the Yellow Pages, television, radio, signage, apparel and sponsorship of community events. Plaintiff's manager, Martin Fauchier, avers that, since 2004, Plaintiff has expended considerable sums on such advertising. *See* Pl. App'x at 23. Plaintiff's financial records partially confirm this information. *See* Hicklins' Supplemental Appendix ("Hicklins' Supp. App'x") (docket no. 89-2) at 288-306.

---

[6] Plaintiff's distribution area includes Benton, Cedar, Iowa, Johnson, Jones and Linn counties.

### D.  Use of the Term "Overhead"

Other entities include the word "overhead" in their trade names and use the term to market their goods and services.  Several companies have filed trademark registrations with the United States Patent and Trademark Office that include the term "overhead." *See* Hicklins' App'x at 69-90 (collecting registrations of various entities using the term "overhead").  Among these companies are several that market garage door products and/or services.  *See id.* at 69 (listing, among others "Precision Overhead Garage Door Service," "Renlita Overhead Doors" and "Advantage Overhead Garage Door Service").  The Hicklins also provide evidence, in the form of telephone directory excerpts, that other entities in various states use the term "overhead" in their advertisements and listings.  It appears that most, if not all, of these companies sell garage door products or services *See, e.g.*, Hicklins' App'x at 121-128 (depicting various telephone directory listings for "overhead" garage door products and services in Omaha, Nebraska, including "Precision Overhead Garage Door Service" and "Langfeldt Overhead Door").

At least one other company in the parties' market, "Dan's Overhead Doors & More," operates and advertises under a name that includes the term "overhead." *See id.* at 185 (depicting advertisement for "Dan's Overhead Doors & More").  In an April 25, 2007, e-mail to Overhead Door Corporation representatives, Fauchier stated, in reference to Dan's Overhead Doors & More, that Plaintiff had been "fighting that for years." *Id.* at 39.1.  However, when asked whether he "ever had any issues with Dan's Overhead[,]" Fauchier testified, "No." *Id.* at 8.  Fauchier also testified that his reference to Plaintiff "fighting" Dan's Overhead Doors & More simply meant that "he is another competitor" and "the use of fighting is loose, to say the least." *Id.* at 8.  Finally, he testified that Plaintiff never reported any potential interference or infringement issues with Dan's Overhead Doors & More "to the Better Business Bureau, never sent it to the State's Attorney General, and . . . never brought a legal case against them . . . ." *Id.*

### E.  The Hicklins

The Hicklins are sole proprietors of a residential installation and repair business for garage doors.  They do business as "Advanced Garage Door Repair" and "A-1 American Garage Door Repair."  Plaintiff's Statement of Material Facts ("Pl. Statement of Facts") (docket no. 71-2) at ¶ 6.  Although the Hicklins market their services under two names, no difference exists between the services each provides and all revenue flows to the Hicklins as sole proprietors.

In March or April of 2007, the Hicklins entered the Cedar Rapids market as Advanced Garage Door Repair for the purpose of selling and repairing garage doors. They subsequently entered the Johnson County market, which includes Iowa City.  The Hicklins maintain one office in Sioux City, Iowa, "where all service calls are answered for scheduling."  Hicklins' Statement of Facts at ¶ 6.  The Hicklins "maintain a warehouse and local contractors in the Cedar Rapids area to respond to customer calls."  *Id.*

### F.  The Hicklins' Advertisements

"During the first 12-18 months of their operations, the Hicklins created and purchased multiple advertisements in Yellow Pages directories prominently featuring the term 'OVERHEAD.'"  Pl. Statement of Facts at ¶ 8.  The Hicklins' advertisements include telephone numbers with a (319) area code.[7]  However, any resulting calls are routed to their Sioux City office.

The Hicklins' first advertisements appeared in 2007 in the Cedar Rapids Dex telephone directory for use through April of 2008.  "The advertisement in the Yellow Pages portion of the directory emphasizes the term 'OVERHEAD' more than any other term."  *Id.* at ¶ 9.  "Randy Hicklin sketched this ad before submitting it to Dex."  *Id.*  The Hicklins also purchased an "inkjet advertisement" in the 2007-08 Dex directory, which "appears on the bottom of the phone book and features the term 'OVERHEAD' as its most

---

[7] The (319) area code includes Cedar Rapids and Iowa City.

prominent feature." *Id.* at ¶ 10. The inkjet advertisement is placed so that it can be seen when the telephone book is lying on its side. Randy Hicklin testified that he chose the term "OVERHEAD" as the most prominent term in the initial advertisements because "[i]t's the most descriptive word for consumers to know the type of work that I do and what they are looking for." Pl. App'x at 39.

"In the next year's Dex phone book, dated April 2009, the Hicklins bought a cover page advertisement for A-1 American Garage Door Repair." Pl. Statement of Facts at ¶ 12. Randy Hicklin designed the advertisement, which does not include the term "OVERHEAD." Rather, it describes the Hicklins' services as "garage door repairs." Pl. App'x at 60. Randy Hicklin testified that he thought the cover page advertisement was an effective message to reach customers. The Hicklins also placed an advertisement for Advanced Garage Door Repair inside the April 2009 Dex directory. This advertisement "prominently features the term 'OVERHEAD' in green and larger font size." Pl. Statement of Facts at ¶ 13.

For the April 2010 Dex directory, the Hicklins again bought a cover advertisement for A-1 American Garage Door Repair. However, unlike the previous year, they "added the term 'OVERHEAD' in red and larger font than the other words on the ad[.]" *Id.* at ¶ 14. The Hicklins also placed an internal advertisement for Advanced Garage Door Repair that "uses larger typeface and red font to emphasize the term 'OVERHEAD.'" *Id.*

A second internal advertisement, located within the alphabetical listing of providers, "also uses bold red lettering to highlight the term 'OVERHEAD.'" *Id.* Randy Hicklin created this advertisement and intentionally emphasized the term "OVERHEAD." "On the Dex mock-up for the ad, handwritten annotations beside Hicklin's writing state 'RED bold as possible.'" *Id.* at ¶ 15. Randy Hicklin testified that, although he did not make this notation, he told a Dex representative to "make the term 'OVERHEAD' as bold as possible." *Id.*

The Hicklins also placed advertisements in the Iowa City Dex directory dated November 2009. "In a mock-up of an ad for the Iowa City Dex directory, [Randy] Hicklin drew an ad containing the word 'OVERHEAD' in largest font, followed by the terms 'garage doors, openers, and repairs.'" *Id.* at ¶ 16. In a mock-up for a Yellow Book directory, Randy Hicklin wrote in the margin that Yellow Book should make the term "overhead" "MUCH LARGER & BOLD STRETCHED OUT." Pl. App'x at 105.

After Plaintiff filed the instant action, the Hicklins purchased additional advertisements in telephone directories. In the Iowa City Dex directory dated November 2010, the Hicklins placed an advertisement featuring the term "CLEARANCE" in the largest typeface. *Id.* at 78. Randy Hicklin testified that he chose the term "clearance" instead of "overhead" for a few reasons:

> Because of the economy, the way it was. My ad changes from year to year, which obviously everything on these ads is different. And I had a competitor[8] that was angry for using the word in my advertising so I decided to take that word out and show them that I could be just as effective in my business without using that word in my ad.

Pl. App'x at 48. In two advertisements placed in the 2010-2011 Cedar Rapids Yellow Book directory, the Hicklins do not use the term "OVERHEAD." *See* Pl. App'x at 80-81. Randy Hicklin also created a mock-up for the 2010-2011 Yellow Book directory that "crossed out the term 'OVERHEAD' and replaced it with the term 'CEDAR RAPIDS.'" Pl. Statement of Facts at ¶ 19; Pl. App'x at 106. When asked why he made this change, Randy Hicklin explained:

> For the same reasons that I indicated earlier. I made advertising changes every year and I wanted to get the Cedar Rapids customers['] first visual, which that's what this—[t]his is the primary source of advertising for my customers, and this

---

[8] Randy Hicklin later clarified that the "competitor" was Overhead Door Company of Cedar Rapids and Iowa City.

is basically visual advertisement, so you want to grab the customers' eyes first and that's what I thought would be most effective to my customers.

Pl. App'x at 49.

### G. The Hicklins' Encounter Confusion

Lyle Lemke, an installer that Advanced Garage Door Repair hired in 2007, testified that he encountered three to four customers each week that had actually intended to contact Overhead Door Company of Cedar Rapids and Iowa City. Lemke testified that, when he encountered these customers, he would leave without doing the work. However, Lemke testified that "Randy [Hicklin] wanted to know why I didn't stay and do the work. He said, you should be charging them a service call."[9] *Id.* at 111.

Lemke testified that he spoke to Randy Hicklin "at least once a month" regarding customer confusion.[10] *Id.* Specifically, Lemke testified that he told Randy Hicklin that the Hicklins' advertisement "was confusing to people, when they look at that, the 'overhead' is in bigger print and [Randy Hicklin] said, yeah, but Advanced is right there beside it." *Id.* Lemke also testified that, during his training with Randy Hicklin, they were "going up the interstate, and [Randy Hicklin] passed one of Overhead's trucks, and

---

[9] The Hicklins raise a hearsay objection to portions of Lemke's testimony. To the extent they object to Lemke's testimony regarding what Randy Hicklin told him, this statement is not hearsay because it is offered against the Hicklins and is Randy Hicklin's own statement. *See* Fed. R. Evid. 801(d)(2)(A).

[10] The Hicklins' object to this testimony as hearsay. Lemke's testimony regarding what he told Randy Hicklin is not hearsay because it is offered against the Hicklins and was made by Lemke, the Hicklins' agent, within the scope of his agency or employment and during the existence of the relationship. *See* Fed. R. Evid. 801(d)(2)(D); *see also Fed. Deposit Ins. Corp. v. First Interstate Bank of Des Moines, N.A.*, 885 F.3d 423, 435 (8th Cir. 1989) ("As a general matter, employee statements made against the interest of an employer are representative admissions and are admissible."). Lemke's testimony regarding what Randy Hicklin told him in response is admissible as an admission. *See* Fed. R. Evid. 801(d)(2)(A).

he looked out and kind of laughed and said, we're going to get a lot of their business."
*Id.* at 112.

Randy Hicklin acknowledges that there has been some confusion among consumers. He explained his take on the cause for confusion:

> Well, if I have caused confusion by advertising large in the [telephone] book in a descriptive way, they haven't been able to find him because of the type of advertising [Plaintiff] is doing in comparison to me. They have not been able to find him, so if he has customers that he has had in the past looking for him, they can't find him.

Pl. App'x at 37. Randy Hicklin also acknowledges that customers have called his business looking for Overhead Door Company of Cedar Rapids and Iowa City. Randy Hicklin described his business's response:

> Well, they tell them this is Advanced Garage Door. We do overhead repair and if they ask, is this the Overhead Door Company, we tell them no, and if they ask if we have their phone number, which sometimes we are actually nice enough to look it up for them.

*Id.* Randy Hicklin recalls instances when his technicians arrived at a customer's home and the customer thought they were having Overhead Door Company of Cedar Rapids and Iowa City do the repairs. Randy Hicklin testified that three technicians reported such incidents.

### H. Customer Experiences

Several of Plaintiff's customers have mistakenly contacted one of the Hicklins' businesses when, in fact, they were trying to reach Overhead Door Company of CedarRapids and Iowa City.

### 1. Greg Allen

Greg Allen manages about twenty rental properties in Iowa City. He has used Overhead Door Company of Cedar Rapids and Iowa City for eight to ten years and is

"very pleased" with the work it has done.  Pl. App'x at 120.  Allen explained that he associates the word "overhead" with Plaintiff's business:

> Q.  Did the term overhead mean something to you in the context of garage door companies?
>
> A.  Yes.
>
> Q.  What did it mean?
>
> A.  To me, that was my company, you know, the overhead garage door company.
>
> Q.  That you worked with for eight to ten years?
>
> A.  Yes.

*Id.* at 124.

Although he usually finds Plaintiff's telephone number by looking for its advertisement in the Yellow Pages, Allen mistakenly contacted Advanced Garage Door Repair after noticing an advertisement "on the edge of the pages" of the telephone book.[11] Allen acknowledges that he "can't see up close" without his glasses and is "not good with the alphabet . . . ."  Pl. App'x at 120.  Allen testified that, throughout his telephone conversation with Advanced Garage Door Repair, he thought he was speaking with Overhead Door Company of Cedar Rapids and Iowa City.  After new parts were installed on Allen's garage door and he was given a bill including the words Advanced Garage Door Repair, Allen still thought he was working with a "repair division" affiliated with Plaintiff. *Id.* at 122.  Allen testified that he could not believe he "made that mistake" and that, after looking at the advertisement for a second time, he "saw [the Advanced Garage Door Repair logo], which [he] paid no attention to" and "that might have tipped [him] off that it was a different company."  *Id.* at 124.

---

[11] The advertisement Allen refers to states "OVERHEAD GARAGE DOOR REPAIRS" and also features the Advanced Garage Door Repair logo, along with a telephone number.  Pl. App'x at 59.

## 2. Jack McArtor

Jack McArtor has owned residential rental properties for over thirty years. He has five garage doors from Overhead Door Company of Cedar Rapids and Iowa City in his rental properties, and has worked with the company for fifteen to twenty years. McArtor has been satisfied with the company's work and would recommend it to others. When McArtor needs to contact Plaintiff's company, he usually looks for the telephone number in the Yellow Pages. McArtor testified that he associates the term "overhead" with Plaintiff's business:

> Q. Let me ask you this; did you associate that term "overhead" with the company Overhead Door Company of Cedar Rapids and Iowa City?
>
> A. I was trying to.
>
> Q. And so when you saw the large "overhead" on [one of the Hicklins' advertisements]--
>
> A. Yes.
>
> Q. -- [on the Hicklins' advertisement] --
>
> A. I assumed that was Overhead Door that I always worked with.
>
> Q. And why did you make that assumption?
>
> A. Because of the word overhead.

*Id.* at 131.

Within the last year or so, McArtor attempted to contact Plaintiff but wound up contacting a different company. McArtor noticed an advertisement on the cover of the telephone book, which features "OVERHEAD" in red letters, followed by "GARAGE DOORS, OPENERS & REPAIRS." *Id.* at 82. The advertisement also features the A-1 American Garage Door Repair logo and a telephone number. McArtor then flipped to the Yellow Pages where he noticed an advertisement featuring "overhead again in big, green,

19

huge, green letters there."[12]  *Id.* at 130.  McArtor testified that he "should have looked for the [red ribbon] emblem" but "for some reason, [he] didn't, so he called [the Hicklins'] number."  *Id.*  McArtor spent about two to three minutes looking for Plaintiff's number in the telephone book.  After calling Advanced Garage Door Repair, McArtor "started looking in the book a little more clearly, and the minute [he saw] the ribbon . . . [he] called there and had no problem."  *Id.*

### 3.    *Shari Saari*

Shari Saari has worked with Overhead Door Company of Cedar Rapids and Iowa City "[m]any times" since the company installed a door in her garage about fifteen or sixteen years ago.  *Id.* at 135.  When she needs to contact Overhead Door Company of Cedar Rapids and Iowa City, Saari looks in the Yellow Pages.  Saari explained that she associates the term "overhead" with Plaintiff's business:

> Q.    Does the term overhead lead to any association, in your
>        mind, for any garage door companies?
>
> A.    It does.  It makes me think of Overhead Garage Door,
>        I guess, from Cedar Rapids.  It's what I think of when
>        I see that even now.

*Id.* at 142.

In 2009, Saari wanted a new garage door installed at a home she had purchased. Saari called her grandson and asked him to provide the telephone number listed on the front of the telephone book.  Saari believed the advertisement was for Overhead Door Company of Cedar Rapids and Iowa City.[13]  Saari called the number on the cover of the

---

[12] The advertisement McArtor refers to states "OVERHEAD GARAGE DOORS, OPENERS & REPAIRS."  *Id.* at 85.  It also includes the Advanced Garage Door Repair logo and a telephone number.

[13] The advertisement Saari refers to is on the cover of the telephone book and states "OVERHEAD GARAGE DOOR COUPONS!"  *Id.* at 82.  It also includes the Advanced
(continued...)

telephone book and believed she was speaking with Overhead Door Company of Cedar Rapids and Iowa.

When a technician arrived at Saari's property, Saari pointed to an Overhead Door Company sticker on the garage door and said "you have been here before." *Id.* at 137. Saari pointed out the sticker because she was "so happy to give them my business . . . ." *Id.* at 138. Saari testified that the technician "didn't say anything" in response to her comment.[14] *Id.*

About a week later, Saari used the telephone book at her workplace to call Overhead Door Company of Cedar Rapids and Iowa City to schedule the installation. When she realized they had no record of the transaction, Saari returned to her property and discovered she had mistakenly hired Advanced Garage Door Repair. Saari testified that, because she had "already paid for half," she called Advanced Garage Door Repair to schedule the installation. *Id.* When she contacted Advanced Garage Door Repair, Saari told them that she "thought they were Overhead Door from Cedar Rapids." *Id.*

---

[13](…continued)
Garage Door Repair logo and a telephone number.

[14] The Hicklins raise a hearsay objection to Saari's testimony regarding the technician's lack of a response. "In some circumstances, silence itself can be . . . a nonverbal assertion." *United States v. Kenyon*, 481 F.3d 1054, 1065 (8th Cir. 2007). "[A] statement is attributable to a person when he or she stands silent in the face of its utterance if the natural response would be to deny it if untrue." *Rahn v. Hawkins*, 464 F.3d 813, 821 (8th Cir. 2006). In these circumstances, a natural response for the technician would be to correct Saari by informing her that he had not been there before and he did not work for Overhead Door Company of Cedar Rapids and Iowa City. Accordingly, Saari's statement is attributable to the technician. This statement also is not hearsay because Plaintiff does not offer it to prove the truth of the matter asserted. *See* Fed. R. Evid. 801(c). Plaintiff offers Saari's testimony not to show that the technician had, in fact, been there before, but to prove that the Hicklins intended to confuse or deceive customers as to the origin of their services.

### 4. Jeffrey DeFrance

Jeffrey DeFrance lives in Iowa City and has done business with Overhead Door Company of Cedar Rapids and Iowa City for 31 years. DeFrance testified that he is loyal to the company because he just "stick[s] with the same company if they do a good job." *Id.* at 144. DeFrance testified that he associates the word "overhead" with Plaintiff's business:

> Q. Focusing on just the term overhead, did you associate that with Overhead Door Company of Cedar Rapids and Iowa City?
>
> A. Yes.

*Id.* at 147.

In May of 2008, "springs broke" on DeFrance's garage door and he had "no way to lock [his] house . . . ." *Id.* at 145. DeFrance attempted to contact Overhead Door Company of Cedar Rapids and Iowa City but wound up contacting Advanced Garage Door Repair. DeFrance noticed an advertisement on the bottom of the telephone book.[15] The telephone book was on top of DeFrance's refrigerator and he just "glanced at it" and called, "because [he] thought it was Overhead Door Company." *Id.* at 145. In his deposition, DeFrance explained:

> if I'd had had half a brain, I would have opened up the Yellow Pages and looked, but I seen it on the butt end of the phonebook stamped on there, and so I panicked. My springs broke, I have no way to lock my house, so I call. My garage door was racked like this (indicating). I didn't want anybody getting in my house.

*Id.*

When DeFrance called the number on the advertisement, he asked, "is this

---

[15] The advertisement DeFrance refers to appears on the bottom of the telephone book and states "OVERHEAD GARAGE DOOR REPAIRS." *Id.* at 98. The advertisement includes the Advanced Garage Door Repair logo and a telephone number.

Overhead Door of Cedar Rapids or Iowa City[?]" *Id.* DeFrance testified that the woman who answered said "yes, yeah."[16] Pl. App'x at 145. DeFrance also testified that, if the woman had said no, he "would have just re-called Overhead Door." *Id.* When the technician arrived, he told DeFrance he was not from Overhead Door Company of Cedar Rapids and Iowa City. However, DeFrance allowed him to perform the repair because he had already given a credit card number and thought he would "get hit for $50, probably, because I called—if somebody's going to come out." *Id.* at 146.

### 5. Linda Norton

Linda Norton, a Cedar Rapids resident, has experience with Overhead Door Company of Cedar Rapids and Iowa City dating back to 1995 or 1996. She describes it as a "[v]ery dependable company" that "did excellent work." *Id.* at 152. Norton testified that she associates the term "overhead" with Overhead Door Company of Cedar Rapids and Iowa City.

In 2009, Norton had a problem with her garage door. Although she attempted to contact Overhead Door Company of Cedar Rapids and Iowa City, Norton mistakenly contacted a different company. Norton testified that "[t]here was a coupon on the front of the telephone book, and all I saw on the coupon was 'overhead door,' so I presumed that's who I was calling."[17] *Id.* at 152. Norton spent "[v]ery little" time looking at the telephone book before calling and "did not look inside the phonebook" after noticing the

---

[16] As with Saari's testimony, the Hicklins raise a hearsay objection to DeFrance's testimony regarding what the woman said. Again, however, this testimony is not hearsay because it is not offered to prove the truth of the matter asserted. *See* Fed. R. Evid. 801(c). Plaintiff offers this testimony to prove that the Hicklins intended to confuse or deceive customers, not to prove that Advanced Garage Door Repair is, in fact, Overhead Door Company of Cedar Rapids and Iowa City.

[17] The coupon Norton refers to appears on the cover of the telephone book and states "OVERHEAD GARAGE DOOR COUPONS!" *Id.* at 65. The advertisement also includes the Advanced Garage Door Repair logo and a telephone number.

coupon on the cover. *Id.* at 153. Norton scheduled a repair and a technician came to replace a spring on her garage door. Norton gave the technician a check made out to "Overhead Door" because she "thought that's who [she] was dealing with, was Overhead Door." *Id.* at 154. The technician accepted the check.

After her garage door problem persisted, Norton "got ahold of the original Overhead Door this time." *Id.* When Norton called Overhead Door Company of Cedar Rapids and Iowa City, they had no record of the repair. At this time, Norton realized she must have been dealing with another company. Norton then contacted Advanced Garage Door Repair to fix the problem. Although a technician came to her home, he did not correct the problem. Norton then "called Overhead Door back again, they came out, measured the spring and put on the right size spring . . ., [at] no charge." *Id.* at 153.

### 6. *Karen Guse*

Karen Guse is a Cedar Rapids resident and owns seven rental properties. She has been familiar with Overhead Door Company of Cedar Rapids and Iowa City since 1977 or 1978, and has used its services about ten to twelve times.

In 2009, Guse purchased a home. However, the garage door did not work. Guse testified that she spent between thirty seconds and one minute looking at the telephone book when she noticed an advertisement "on the side printed on it in black . . . that said Overhead Door."[18] *Id.* at 161. Guse acknowledges that she did not spend a "sufficient amount" of time looking at the telephone book, but she "just basically saw it, and it said 'overhead.'" *Id.* at 162. Guse testified that she was "not thinking that I would have to look for the little red ribbons" and did not memorize their number, so she "just called." *Id.* When Guse called the telephone number on the advertisement, she thought she was

---

[18] The advertisement Guse refers to appears on the bottom of the telephone book and states "OVERHEAD GARAGE DOOR REPAIRS." Pl. App'x at 59, 63. The advertisement includes the Advanced Garage Door Repair Logo and telephone number, and indicates they offer a "FREE Service Call." *Id.*

contacting Overhead Door Company of Cedar Rapids and Iowa City. In her deposition, Guse acknowledged that, "If I'd been smarter, I would have looked at that more closely, but it said 'overhead' in large letters. There were no red ribbons, because it was only black printing on the phone book." *Id.* at 162.

## I. The Magid Survey

In early 2010, Plaintiff hired Robert M. Crawford, Ph.D., of Frank N. Magid Associates to conduct a market research study among both general consumers and current customers of Overhead Door Company of Cedar Rapids and Iowa City. General consumers and Plaintiff's customers were asked whether a company or companies come to mind when they hear the word "overhead." 68% of consumers said yes, while 81% of Plaintiff's customers said yes. Of the consumers, 60% associate the term "overhead" with Plaintiff and 39% associate it with Dan's Overhead Doors & More. Of Plaintiff's customers, 83% associate the term with Plaintiff and 22% associate "overhead" with Dan's Overhead Doors & More. With respect to market-wide association of the term "overhead," the Magid Survey reveals the following: (1) of general consumers, 41% associate the term with Overhead Door Company of Cedar Rapids and Iowa City, 26% associate the term with Dan's Overhead Doors & More and 32% do not associate a particular company with "overhead" and (2) of Plaintiff's customers, 68% associate "overhead" with Overhead Door Company of Cedar Rapids and Iowa City, 18% associate it with Dan's Overhead Doors & More and 19% do not associate "overhead" with a particular company.

## J. The Hicklins' "Certified" Technicians

In their telephone directory advertisements, and on shirts worn by Advanced Garage Door Repair technicians, the Hicklins represent that their technicians are "certified." *See* Pl. App'x at 183 (depicting shirt bearing "Certified Technicians" insignia). The technicians' certification is based solely on a list that Randy Hicklin created. In other

words, no independent entity certified the Hicklins' technicians. Randy Hicklin testified that he has trained his technicians based on the same criteria "since 2002." Pl. App'x at 40. One of the Hicklins' technicians, Lance Cross, testified that Randy Hicklin trained and certified him when he was hired.

"After [Plaintiff] challenged the Hicklins' use of the term 'certified' in connection with [their] technicians, the Hicklins removed the word from Yellow Pages advertising." Pl. Statement of Facts at ¶ 78. Randy Hicklin removed the term "certified" because he "didn't know if [he] was doing something wrong by putting that in there." Pl. App'x at 49. Randy Hicklin testified that his doubts resulted from Plaintiff bringing the instant action.

## VII. ANALYSIS

The Hicklins ask the court to grant summary judgment in their favor on all claims. The court addresses each claim, in turn.

### A. Infringement Claims

Plaintiff's infringement claims[19] require proof of two essential elements. First, Plaintiff must establish it has a protectible interest in the mark at issue. *Commercial Sav. Bank v. Hawkeye Fed. Sav. Bank.*, 592 N.W.2d 321, 326 (Iowa 1999); *Duluth News-Tribune v. Mesabi Publ'n, Inc.*, 84 F.3d 1093, 1096 (8th Cir. 1996). Second, if Plaintiff has a protectible interest, it must prove that the Hicklins have infringed upon that right. *Commercial Sav. Bank*, 592 N.W.2d at 326; *Duluth News-Tribune*, 84 F.3d at 1096. Infringement is judged by asking whether there is a likelihood of confusion among consumers. *Commercial Sav. Bank*, 592 N.W.2d at 329; *Duluth News-Tribune*, 84 F.3d at 1096.

---

[19] Plaintiff's infringement claims are: common law service mark infringement (Count I), common law trade name infringement (Count II) and service mark infringement under § 43(a) of the Lanham Act (Count III). Because these claims require proof of the same elements, the court considers them together.

The Hicklins contend that Plaintiff's infringement claims fail for any one of three reasons. First, they argue that the term "overhead"[20] is generic and entitled to no trademark protection. Second, they argue that, even if the term is descriptive, it is entitled to no protection because it has not acquired secondary meaning. Third, they argue that even if Plaintiff can establish a protected interest in the term "overhead," there is no genuine issue of material fact with respect to the likelihood of confusion. First, the court considers whether Plaintiff has a protectible interest in the term "overhead." If Plaintiff has such an interest, the court will address the likelihood of confusion.

### 1. Strength of a mark

To determine whether a mark is sufficiently distinctive to deserve protection, both federal and Iowa courts classify marks into one of four categories, ranging from weakest to strongest: (1) generic; (2) descriptive; (3) suggestive; or (4) arbitrary or fanciful. *See Commercial Sav. Bank*, 592 N.W.2d at 327 (listing categories for purposes of common law infringement claims under Iowa law); *Duluth News-Tribune*, 84 F.3d at 1096 (listing categories for purposes of Lanham Act infringement claims).

### 2. "Overhead" is a generic term

Generic marks, which merely describe "the general category, type, or class of

---

[20] Plaintiff refers to both "Overhead" and "Overhead Door Company of Cedar Rapids and Iowa City" as its unregistered service marks. *See* Second Amended Complaint at ¶¶ 14-15. In the Motion for Summary Judgment, however, the Hicklins focus entirely on Plaintiff's claims with respect to the term "overhead," arguing that "there is no evidence that [the Hicklins'] advertisements have mimicked the use of [Overhead Door Company of Cedar Rapids and Iowa City.]" Brief in Support of Hicklins' Motion for Summary Judgment ("Hicklins' Brief") (docket no. 68-1) at 3 n.3. In its Resistance, Plaintiff likewise focuses solely on the Hicklins' use of the term "overhead" and does not argue that the Hicklins have utilized or otherwise infringed upon "Overhead Door Company of Cedar Rapids and Iowa City." Accordingly, the court limits its analysis to whether the Hicklins' have infringed upon any protected interest Plaintiff may have in the term "overhead."

goods, services or business," are not entitled to trademark protection. *Commercial Sav. Bank*, 592 N.W.2d at 327 n.2; *see also Duluth News-Tribune*, 84 F.3d at 1096 ("[A] generic term is one that is used by the general public to identify a category of goods, and as such merits no trademark protection."). In other words, a "'generic' mark is the common name of a product or service—'the genus of which the particular product is a species.'" *Home Builders Ass'n of Greater St. Louis v. L&L Exhibition Mgmt. Inc.*, 226 F.3d 944, 949 (8th Cir. 2000) (quoting *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 194 (1985)). "A generic term does not identify the source of a product, but rather indicates the basic nature of the product." *Schwan's IP, LLC v. Kraft Pizza Co.*, 460 F.3d 971, 974 (8th Cir. 2006). A generic term "is not afforded trademark protection even if it becomes associated with only one source, . . . for a competitor must be able to describe his goods as what they are." *Id.* (internal citation and quotation marks omitted).

"In deciding genericness, evidence of the relevant public's understanding of a term 'may be obtained from any competent source.'" *Id.* (quoting *In re Merrill Lynch, Pierce, Fenner, & Smith, Inc.*, 828 F.2d 1567, 1570 (Fed. Cir. 1987)). Thus, genericness may be established "with evidence such as 'newspapers and other publications, generic use by competitors, generic use of the term by the party bringing suit, and use of the term by third parties in trademark registrations.'" *Id.* at 974-75 (quoting *Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 406 (6th Cir. 2002)); *see also Steak n Shake Co. v. Burger King Corp.*, 323 F. Supp. 2d 983, 992 (E.D. Mo. 2004) (noting that a court may consider "dictionaries, newspapers, consumer surveys, advertisements, and other publications").

At the outset, Plaintiff insists that the classification of a mark is a fact question for the jury. Plaintiff correctly notes that the Eighth Circuit Court of Appeals has stated that "[h]ow a particular word has been used and how it has been understood by the public is a question of fact" and the "correct categorization of a given term is also a factual issue."

*WSM, Inc. v. Hilton*, 724 F.2d 1320, 1325-26 (8th Cir. 1984). However, numerous courts, including the Eighth Circuit Court of Appeals, have held that a mark may be found generic as a matter of law. *See Schwan's*, 460 F.3d at 976 (affirming grant of summary judgment on grounds that the term "Brick Oven" is generic); *Best Buy Warehouse v. Best Buy Co., Inc.*, 920 F.2d 536, 537 (8th Cir. 1990) (per curiam) (affirming summary judgment in favor of defendant where district court "held that the phrase 'best buy' is generic as a matter of law"). Accordingly, the classification of the term "overhead" as generic is an issue amenable to resolution on summary judgment.

Several courts have considered the proper classification of terms in similar circumstances and found them to be generic. In *Schwan's*, the plaintiff claimed it had a protectible interest in the term "Brick Oven." 460 F.3d at 974. The Eighth Circuit Court of Appeals rejected this claim, holding that "summary judgment was appropriate and that the district court correctly held that Brick Oven, as used to identify pizza, is a generic term." *Id.* at 975. The Eighth Circuit Court of Appeals noted that, among other things, the term simply refers to a pizza that is cooked in a brick oven, the plaintiff's frozen pizza competitors had used the term to describe their products, and a retail trade magazine's website used the term generically when describing market growth. *Id.*

Similarly, in *Miller Brewing Co. v. G. Heileman Brewing Co., Inc.*, the Seventh Circuit Court of Appeals held that the term "light" is generic when used with "beer." 561 F.2d 75, 80 (7th Cir. 1977). The Seventh Circuit Court of Appeals considered the dictionary definition of the word "light" and noted that the term "has been widely used in the beer industry for many years to describe a beer's color, flavor, body, or alcoholic content, or a combination of these or similar characteristics." *Id.*

The reasoning employed in the *Miller Brewing* and *Schwan's* cases leads the court to conclude that the term "overhead" is generic when used in connection with garage doors. The Hicklins put forth evidence showing that Plaintiff's competitors use the term

"overhead" to describe their products and services.[21]  For example, one company in the parties' market operates and advertises under the name "Dan's Overhead Doors & More." Hicklins' App'x at 185.  A competitor's use of the term supports a finding of genericness. *See Schwan's*, 460 F.3d at 975 (holding that use of the term "brick oven" by plaintiff's frozen pizza competitors supported district court's finding that term was generic).

Plaintiff's reaction to Dan's Overhead Doors & More's use of "overhead" also supports the term's genericness.  Fauchier testified that Plaintiff never had "issues" with Dan's Overhead Doors & More and never reported any potential infringement based on the use of the term "overhead."  "Generic use by competitors which has not been contested" by Plaintiff is one type of evidence useful to prove the term's genericness. McCarthy, *Trademarks and Unfair Competition*, § 12:13 (4th ed. 2010) (hereinafter, "McCarthy").  Plaintiff's apparent acquiescence to Dan's Overhead Doors & More's use of the term "overhead" further illustrates the word's generic status.

The dictionary definition of "overhead" also supports a finding of genericness. "The dictionary definition of a word is an appropriate and relevant indication of the ordinary significance and meaning of words to the public." *WSM, Inc.*, 724 F.2d at 1327. Merriam-Webster's Online Dictionary defines the adjective "overhead" as "operating, lying, or coming from above" or "having the driving part above the part driven." *Available at* http://merriam-webster.com/dictionary/overhead (last visited December 2,

---

[21]  As noted earlier, the Hicklins provide evidence, including telephone directory excerpts and United States Patent and Trademark Office filings, which reflect that, nationally, numerous third parties use the term "overhead" to market and sell their goods or services.  To the extent such evidence is relevant, the court finds that it supports a finding that the term "overhead" is generic.  *See Schwan's*, 460 F.3d at 975 (stating that "use of the term by third parties in trademark registrations" may be indicative of genericness); *Boston Duck Tours, LP v. Super Duck Tours, LLC*, 531 F.3d 1, 19-20 (1st Cir. 2008) (holding that the "widespread generic use of 'duck' and 'duck tours' by other companies around the country" "indicates that when consumers hear the term 'duck tours,' they associate it primarily with a product rather than a source").

2010).  Merriam-Webster's indicates that the first known use of "overhead" was in 1874. *Id.*  In this case, the term "overhead" simply describes an object—here, a door—that operates or comes from above.

Plaintiff advances several arguments against a genericness finding.  First, Plaintiff contends that many of its customers associate the term "overhead" with "a company, not a generic product or service."  Resistance at 8.  Similarly, Plaintiff posits that the Magid Survey confirms the term is not generic because it shows "'both consumers and customers associate the term 'overhead' with a particular source of goods and services, namely Overhead Door Company of Cedar Rapids and Iowa City.'"  Resistance at 8 (quoting Magid Survey, Pl. App'x at 167).

The Magid Survey does not alter the court's conclusion that "overhead" is a generic term.  Plaintiff's reliance on the Magid Survey ignores the distinct role such evidence plays in cases involving a "coined" term versus those involving a term commonly used prior to its association with the product or service at issue.  *See Hunt Masters, Inc. v. Landry's Seafood Rest., Inc.*, 240 F.3d 251, 255 (4th Cir. 2001) (*cited with approval in Schwan's*, 460 F.3d at 975) (holding that customer survey was irrelevant as to whether the phrase "crab house" was generic where the plaintiff did not claim to have first coined the term). Customer survey evidence is most often used where the term at issue "began life as a 'coined term'" but is "alleged to have become generic through common usage."[22]  *Id.* (citing *Miller Brewing*, 605 F.2d at 995).  However, when the relevant term is not a "coined term" but rather "was commonly used prior to its association with the products at issue[,]" "it is not necessary to determine whether the term has become generic through common use . . . ."  *Hunt Masters*, 240 F.3d at 255.

Plaintiff does not claim that it coined the term "overhead" or that the word

_____

[22] The *Hunt Masters* court listed "aspirin," "teflon" and "thermos" as examples of "coined" terms.  *Id.*

otherwise began life as a coined term. It appears that the term was commonly used before its association with the products involved in this case. Accordingly, the Magid Survey is irrelevant with respect to whether "overhead" is a generic term. *See Schwan's*, 460 F.3d at 975-76 ("Brick Oven was commonly used before either party began labeling their frozen pizzas with the term, and it was not error for the district court to omit the survey evidence from its genericness analysis.").

For similar reasons, the court rejects the significance Plaintiff attaches to the anecdotal evidence of customer association of the term "overhead" with Plaintiff's business. As with the Magid Survey, Plaintiff's argument "does not recognize that evidence of public understanding is not an issue of fact in the case of a common word used in accordance with its accepted meaning." *Team Cent. Inc. v. Xerox Corp.*, 606 F. Supp. 1408, 1413-14 (D. Minn. 1985); *see also First Nat'l Bank & Trust Co. of Colombia, Mo. v. First Nationwide Bank*, No. 8704218-CV-C-9, 1990 WL 64768, at *4 (W.D. Mo. Apr. 9, 1990) (holding that, because the term at issue was not an invented word, the buyer understanding test did not apply and the "only question" was whether the term was "a commonly used and commonly understood term prior to its association with plaintiff's bank").

In *Team Central*, the district court rejected the plaintiff's claim that documented instances of public confusion were evidence that the defendant was using the term "'Team Xerox' as a trademark, i.e., to identify the source of its products." 606 F. Supp. at 1413. As with the term "team" in *Team Central*, the Hicklins use the term "overhead" in accordance with its accepted meaning. "'Once a term is proven to be generic, evidence of purported buyer association of the term with a single source will not change the result.'" *Id.* at 1414 (quoting McCarthy, *Trademarks and Unfair Competition*, § 12:15 (2d Ed. 1984)); *see also Steak n Shake*, 323 F. Supp. 2d at 993 (holding that consumer survey was irrelevant as to whether term was generic and noting that "[a]t most, [the consumer study]

is directed at consumer awareness of the term and consumer familiarity with Steak n Shake, which advertises heavily that it is 'Famous for Steakburgers.'"). The anecdotal evidence of Plaintiff's customers associating the term "overhead" with Plaintiff's business does not alter the generic nature of the term.

Plaintiff argues that "overhead" is descriptive, rather than generic, because "the telephone directories do not contain a listing for 'overhead' garage doors." Resistance at 9. Rather, "[t]he publishers use categories for 'doors' and 'garage doors.'" *Id.* Plaintiff cites no authority for this proposition. In any event, the court finds it is without merit. As previously discussed, the Eighth Circuit Court of Appeals in *Schwan's* held that the term "Brick Oven" is generic when used in reference to pizza. Plaintiff's position would appear to counsel the opposite result if, when searching the phone book for restaurants serving brick oven style pizza, one had to look under a "pizza" category rather than a "brick oven pizza" category. The genericness of a term is not synonymous or co-extensive with that term's stature as a separate category in a telephone directory. The court finds that the term "overhead" may be a generic term regardless of whether that term supports a separate section of the phone book.[23]

---

[23] Plaintiff's argument is essentially an effort to expand the scope of the "genus" of the product at issue from "overhead doors" to simply "garage door." *See* Resistance at 8 (citing Fauchier's testimony that "the whole industry is called the garage door business"). To the extent that Plaintiff implicitly argues that an adjective such as "overhead" cannot be a generic term, the court disagrees. *See Nat'l Nonwovens, Inc. v. Consumer Prods. Enter., Inc.*, 397 F. Supp. 2d 245, 252 (D. Mass. 2005) (rejecting plaintiff's attempt to define the genus of products as "fabric" or "felt" rather than "wool felt" as a "subtle rhetorical move that attempts to abstract to a higher level of generality"). As the court explained in *National Nonwovens*, "although the term 'beer' correctly identifies both 'light beer' and 'honey brown,' the existence of this general term has not prevented courts from finding both specific terms to be generic." *Id.* (citing *Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137 (2d Cir. 1997) (holding "honey brown" generic); *Miller Brewing*, 561 F.2d 75 (holding "light beer" generic)). Likewise, although
(continued...)

For the foregoing reasons, the court holds that "overhead" is a generic term when used in connection with garage doors.  As a generic term, Plaintiff cannot establish a protectible interest in the term "overhead."  *See Commercial Sav. Bank*, 592 N.W.2d at 327 n.2; *Duluth News-Tribune*, 84 F.3d at 1096.  Therefore, the court shall grant the Motion for Summary Judgment to the extent it seeks dismissal of Plaintiff's claims for common law service mark infringement (Count I) and common law trade name infringement (Count II).  The court shall also dismiss Count III of the Second Amended Complaint insofar as it alleges service mark infringement in violation of Lanham Act § 43(a).

### 3.    *Likelihood of confusion*

In light of the court's finding that Plaintiff does not have a protectible interest in the term "overhead," it need not consider the likelihood of confusion.

## B. *Lanham Act Unfair Competition Claims*

Plaintiff alleges in Counts III and IV that the Hicklins have engaged in unfair competition under § 43(a) of the Lanham Act.[24]  In Count III, Plaintiff alleges that the

---

[23](…continued)
the terms "door" or "garage door" correctly identify an "overhead" door, the existence of more general terms does not preclude a finding that "overhead" is a generic term.  *See* 2 McCarthy § 12:10 ("[M]ost people would intuitively agree that in the following examples that include a noun and a modifier, the combination should be regarded as a generic name, not available for ownership by any one seller: red wine; dinner table; flat screen TV; laptop computer; woman's business suit.").

[24] Section 43(a) provides, in part: "Any person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin" which is likely to cause confusion, mistake, or to deceive, "shall be liable in a civil action . . . ."  15 U.S.C. § 1125(a)(1).  "The typical Lanham Act claim involves one of two factual patterns: (1) a defendant's false advertising of its goods or services; or (2) the selling or 'palming off' by a defendant of its goods by use of a competitor's name."  *Pioneer Hi-Bred Int'l v. Holden Found. Seeds,*

(continued…)

Hicklins' "use of the term 'overhead' in the context of their advertising and other representations to consumers and potential consumers . . . constitutes unfair competition and/or a false designation of origin." Second Amended Complaint at ¶ 29. Plaintiff alleges that the Hicklins' conduct is "likely to deceive and has deceived customers and potential customers into believing that [the Hicklins'] garage door installation and repair services are those of [Plaintiff] and/or are affiliated with [Plaintiff]." *Id.* at ¶ 30. In Count IV, Plaintiff alleges that the Hicklins have "misrepresented the nature, characteristics, qualities or geographic origin of their services and commercial activities . . . ." *Id.* at ¶ 35.

### 1.    *Passing off*

Plaintiff's unfair competition claim alleged in Count III is essentially a claim of passing off. "Passing off," as its name implies, "occurs where a company sells its goods or services under the pretense that they are the goods or services of another." *DaimlerChrysler AG v. Bloom*, 315 F.3d 932, 937 (8th Cir. 2003). Plaintiff contends that the Hicklins "deliberately styled their advertising to palm off their services as coming from [Plaintiff]."[25]    Resistance at 19. Plaintiff also argues that the Hicklins have misrepresented their business as Overhead Door Company of Cedar Rapids and Iowa City.

### a.    *Legal background*

The court's finding that "overhead" is a generic term does not bar Plaintiff's passing off claim. The term's generic status merely means that it is "not protected from

---

[24](…continued)
*Inc.*, 35 F.3d 1226, 1241 (8th Cir. 1994).

[25] "The terms 'palming off' and 'passing off' are used interchangeably to refer to various types of activities or trade practices which lead the consumer to believe he or she is purchasing one product when actually he or she is purchasing another product." *Roulo v. Russ Berrie & Co., Inc.*, No. 82 C 2668, 1986 WL 4718, at *5 n.2 (N.D. Ill. Apr. 14, 1986).

copying." *Home Builders Ass'n*, 226 F.3d at 950. However, if a generic mark "has acquired secondary meaning, § 43(a) relief may be appropriate to require the copier to take reasonable measures to eliminate public confusion as to the source of its competing product or service." *Id.*; *see also WSM, Inc.*, 724 F.2d at 1331 n.5 ("Even a generic mark may be entitled to protection from unfair competition if the mark is 'so associated with its goods that the use of the same or similar marks by another company constitutes a representation that its goods came from the same source.").

Stated differently, "[r]egardless of whether its mark is registered or even registrable, the plaintiff may show that its mark is 'so associated with its goods that the use of the same or similar mark by another company constitutes a representation that its goods come from the same source.'" *Metric & Multistandard Components Corp. v. Metric's, Inc.*, 635 F.2d 710, 714 (8th Cir. 1980) (quoting *Joshua Meier Co. v. Albany Novelty Mfg. Co.*, 236 F.2d 144, 147 (2d Cir. 1956)); *see also Forschner Group, Inc. v. Arrow Trading Co., Inc.*, 904 F. Supp. 1409, 1416 (S.D.N.Y. 1995) ("Although genericness prevents a word or phrase from attaining trademark protection, it does not prevent a court from determining whether a competitor's later use of that word or phrase is unfair.") (collecting cases). "If the plaintiff can establish that use of its mark by a competitor constitutes such a false designation of origin or false representation and if the public is likely to be confused by that use, the plaintiff is entitled to protection under section 43(a) of the Lanham Act." *Metric*, 635 F.2d at 714.

When a generic term is involved, "a competitor's use of that name, without more, does not give rise to an unfair competition claim under section 43(a) of the Lanham Act." *Blinded Veterans Ass'n v. Blinded Am. Veterans Found.*, 872 F.2d 1035, 1043 (D.C. Cir. 1989). However, "such a claim 'might be supportable if consumer confusion or a likelihood of consumer confusion arose from the failure of the defendant to adequately identify itself as the source of the product.'" *Id.* (quoting *Liquid Controls Corp. v. Loquid*

*Control Corp.*, 802 F.2d 934, 939 (7th Cir. 1986)). Similarly, a plaintiff may establish passing off if the defendant has engaged in potentially confusion-generating practices. *Cf. Miller Brewing*, 605 F.2d at 997 (rejecting passing off claim because the defendant adequately identified itself as the source of its beer, did not use a "confusingly similar dress"and did not use "advertising calculated to lead to confusion").

The Eighth Circuit Court of Appeals likewise requires something more than the mere use of a generic term to sustain a passing off claim. *See Home Builders Ass'n*, 226 F.3d at 950 (noting that, even if the plaintiff's trade dress were functional, plaintiff was entitled to § 43(a) relief where the district court found that the defendant "intentionally attempted to trade on [the plaintiff's] good will and reputation," its actions "have caused actual confusion among consumers" and the defendant's corrective actions "were inadequate to end the confusion"); *Metric*, 635 F.2d at 714 (holding that, even if the plaintiff's mark were generic, the defendant violated § 43(a) because it "created a great likelihood of confusion when it used the name 'Metric's' in conjunction with catalogues that were nearly exact copies of [the plaintiff's] sales materials").

To recover for unfair competition in the form of passing off, Plaintiff must show: "1) an association of origin between the mark and the first user, that is, secondary meaning; and 2) a likelihood of consumer confusion when the mark is applied to the second user's good[.]" *Genesee Brewing Co.*, 124 F.3d at 150 (*cited with approval in Home Builders Ass'n*, 226 F.3d at 950) (citation and quotation marks omitted). However, the Hicklins may still "escape liability if [they have] 'used every reasonable means to prevent confusion' as to the source of [their] products[.]" *Id.* (quoting *Kellogg Co. v. Nat'l Biscuit Co.*, 305 U.S. 111, 121 (1938)). The court turns to consider whether the term "overhead" has acquired secondary meaning, and, if so, whether a likelihood of confusion exists.

### b. Secondary meaning

The threshold issue is whether consumers associate the term "overhead" with a particular manufacturer of garage doors and/or provider of garage door repair services. "To establish secondary meaning,[26] the user must show that the mark or symbol by long and exclusive use and advertising in the sale of the user's goods has become so associated in the public mind with such goods that it serves to identify them and distinguish them from the goods of others." *Co-Rect Prods., Inc. v. Marvy! Adver. Photography, Inc.*, 780 F.2d 1324, 1330 (8th Cir. 1985) (internal quotation marks and alterations omitted). "[T]he ultimate inquiry is whether in the consumer's mind the mark denotes a single thing coming from a single source." *Id.* (quotation marks and citation omitted).

Direct evidence of secondary meaning most often comes in the form of consumer

---

[26] It is unclear whether the type of "secondary meaning" necessary to establish passing off is precisely the same as the "secondary meaning" in questions of trademark protection. *See Blinded Veterans Ass'n*, 872 F.2d at 1045 n.22 (noting that "the association between a generic term and one particular source" is sometimes referred to as "'de facto secondary meaning'") (quoting McCarthy § 12:15 at 562-65); *Vanwyk Textile Sys., B.V. v. Zimmer Mach. Am., Inc.*, 994 F. Supp. 350, 377-79 (W.D.N.C. 1997) (considering "whether Section 43(a) passing off claims, as distinct from infringement claims, require formal proof of secondary meaning"). Regardless, for purposes of passing off, a plaintiff must show, at minimum, that "people associate the generic term" with the plaintiff. *See Blinded Veterans Ass'n*, 872 F.2d at 1046 n.24 ("Because we have ruled out the question of trademark protection, [the plaintiff] is not called upon to show 'secondary meaning' in that setting. [The plaintiff] nevertheless must show . . . that people associate the generic term . . . with [the plaintiff]."). A leading commentator has observed that the notion of a generic term with secondary meaning is incongruous. *See* McCarthy § 12:46 ("Once determined to be generic, any proof of 'secondary meaning' or trademark significance seems contradictory to the very concept of a 'generic name.'"). However, McCarthy also recognizes the viability of a passing off claim involving a generic term if the user can show "some false or confusing usage by the newcomer *above and beyond* mere use of the generic name." *Id.* at § 12:48. "This might include, for example, packaging and advertising words or graphics which, in combination with the generic term, cause mistake or confusion as to source." *Id.*

testimony and surveys. *See Heartland Bank v. Heartland Home Fin., Inc.*, 335 F.3d 810, 819 (8th Cir. 2003) (Smith, J., concurring) (citing 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 15.30 (4th ed. 1999)). Circumstantial evidence typically includes: (1) exclusivity, length and manner of use; (2) the amount and manner of advertising; (3) the amount of sales and number of customers; (4) an established place in the market; and (5) proof of intentional copying. *Id.* Because direct evidence of secondary meaning may be difficult to obtain, circumstantial evidence "can be sufficient to meet a party's burden of proof to establish a claim." *Heartland Bank*, 335 F.3d at 820 (Smith, J., concurring).

The court finds there is a genuine issue of material fact as to whether the term "overhead" has acquired secondary meaning. The Overhead Door distributorship has existed as Overhead Door Company of Cedar Rapids and Iowa City since 1956. Plaintiff has used the term in its d/b/a name and advertising efforts since 2004. The Hicklins argue that Plaintiff's use of the term "overhead" is not exclusive, particularly in light of Dan's Overhead Doors & More. However, whether a plaintiff's use is exclusive is just one of several factors from which an inference of secondary meaning may be found.

Other factors, including Plaintiff's advertising efforts, amount of sales, evidence of customer association and/or confusion and proof of intentional copying could also support a jury finding of secondary meaning. Since 2007, Plaintiff has produced substantial revenue through residential sales and service. *See* Pl. App'x at 24. Plaintiff's advertising and marketing efforts include trade shows, apparel, yellow pages advertisements, radio and television. Plaintiff's records indicate that, since 2005, it has spent fairly substantial sums on these items. Since 2004, Fauchier avers that Plaintiff's overall marketing and advertising expenditures have been relatively substantial, and Plaintiff's financial records partially confirm this information. *See id.* at 23; Hicklins' Supp. App'x at 288-306. The term "overhead" permeates many of Plaintiff's advertisements.

Additionally, Plaintiff offers the testimony of several customers that they associate the term "overhead" with Overhead Door Company of Cedar Rapids and Iowa City. This type of evidence is generally "most probative of secondary meaning . . . ." *Frosty Treats, Inc. v. Sony Computer Entm't Am., Inc.*, 426 F.3d 1001, 1005 (8th Cir. 2005). These customers also testified that, when they attempted to contact Overhead Door Company of Cedar Rapids and Iowa City, they mistakenly called the Hicklins' business. *See Am. Ass'n for Justice v. The Am. Trial Lawyers Ass'n*, 698 F. Supp. 2d 1129, 1143 (D. Minn. 2010) (holding that fact issue existed as to secondary meaning, in part because two attorneys mistakenly sent membership dues to the defendant). Finally, as explained more fully below with respect to the likelihood of confusion, the court finds that the record contains sufficient evidence for a juror to conclude that the Hicklins intentionally used and emphasized the term "overhead" in their advertisements in an effort to confuse or deceive consumers. *See Frosty Treats*, 426 F.3d at 1005 (noting "the existence of intentional copying" as one type of circumstantial evidence that may establish secondary meaning).

The court agrees with the Hicklins that the Magid Survey is irrelevant to secondary meaning because it seeks consumer opinions in February 2010—approximately three years after the Hicklins entered the market. The user of a mark must "show that secondary meaning existed prior to the date on which the defendant commenced using the same or similar mark." *Co-Rect Prods., Inc.*, 780 F.2d at 1330. It is undisputed that the Magid Survey was conducted in and measures consumer opinions as of February 2010. Thus, the Magid Survey is irrelevant as to whether the term "overhead" had acquired secondary meaning when the Hicklins entered the market in early 2007. *See Schwan's IP, LLC v. Kraft Pizza Co.*, 379 F. Supp. 2d 1016, 1024 (D. Minn. 2005) (holding that consumer survey was "irrelevant for the establishment of secondary meaning" because it was conducted months after the defendant's product entered the market). Robert Crawford, who conducted the Magid Survey, confirmed this problem in his deposition:

Q. Would it be true that the statement of your two opinions found [in the Magid Survey] are as of February 28th, 2010?

A. That's correct.

Q. One cannot infer whether they would be valid or reliable one month, three months, six months, one year before then. Would that be a fair statement?

A. Yeah. Yes.

Hicklins' App'x at 21. Accordingly, the court finds that the Magid Survey fails to demonstrate secondary meaning at the time the Hicklins entered the market.[27]

The lack of relevant survey evidence does not preclude Plaintiff from establishing secondary meaning. *See Heartland Bank*, 335 F.3d at 819 (Smith, J., concurring) (noting that secondary meaning may be shown by circumstantial evidence, even in the absence of consumer surveys). Here, Plaintiff offers evidence of secondary meaning in the form of customer testimony. Coupled with the other evidence outlined above, the court finds that a jury could reasonably infer that the term "overhead" has acquired secondary meaning. Accordingly, the court must turn to consider whether there is a genuine issue of material fact with respect to a likelihood of confusion.

### c. Likelihood of confusion

As previously noted, the Hicklins' mere use of the term "overhead" is not enough for Plaintiff to succeed on its passing off claim. Plaintiff must also show that the Hicklins'

---

[27] Even if the Magid Survey were relevant, the court finds that its results provide little support for a claim of secondary meaning. The Magid Survey shows that consumers use the term "overhead" to identify multiple companies—namely, Plaintiff and Dan's Overhead Doors and More—and associate the term "Garage Door" with the same sources. The Magid Survey provides, at best, marginal support for secondary meaning. *See* McCarthy § 15:42 ("A survey should reveal that respondents use the designation or trade dress to identify a single source, not that the [plaintiff] is listed as the first among several sources with which respondents associate the designation or trade dress.").

use of that term creates a likelihood of confusion among consumers. For trademark infringement purposes,[28] a court must consider six factors in deciding whether a likelihood of confusion exists:

> 1) the strength of the trademark; 2) the similarity between the parties' marks; 3) the competitive proximity of the parties' products; 4) the alleged infringer's intent to confuse; 5) evidence of actual confusion; and 6) the degree of care reasonably expected of potential customers.

*Duluth News-Tribune*, 84 F.3d at 1096. "These factors do not operate in a mathematically precise formula" and the court should use them "at the summary judgment stage as a guide to determine whether a reasonable jury could find a likelihood of confusion." *Id.* "Factual disputes regarding a single factor are insufficient to support the reversal of summary judgment unless they tilt the entire balance in favor of such a finding." *Id.*

### i.    Strength of Plaintiff's mark

As explained above, the term "overhead" is generic. As the weakest type of mark, the court concludes that this factor weighs against a likelihood of confusion.

### ii.    Similarity between the parties' marks

In considering the similarity between the parties' marks, the court "must look to the overall impression created by the marks, not merely compare individual features."

---

[28] It is somewhat unclear whether a court should weigh the same factors in assessing the likelihood of confusion in a passing off claim. *Compare Borescopes R Us v. 1800endoscope.com, LLC*, No. 3-09-00102, 2010 WL 2991042, at *12-13 (M.D. Tenn. July 26, 2010) (choosing to apply similar eight-factor test to unfair competition passing off claim) *with Forschner Group*, 904 F. Supp. at 1420 n.15 (declining to apply multi-factor test to unfair competition claim and stating that, "[a]lthough a 'likelihood of confusion' is indeed the cornerstone of both unfair competition and trademark infringement analysis, [the multi-factor test] presupposes the existence of a valid trademark"). However, courts weigh similar factors regardless of whether they explicitly apply the same standard applicable to trademark infringement cases. Accordingly, the court shall apply the Eighth Circuit Court of Appeals' multi-factor test.

*Luigino's, Inc. v. Stouffer Corp.*, 170 F.3d 827, 830 (8th Cir. 1999). The court "may consider the marks' visual, aural, and definitional attributes and compare the trade dress of products in determining whether the total effect conveyed by the two marks is confusingly similar." *Id.*

A review of the parties' marks reveals both similarities and differences. Perhaps most noticeably, both parties tend to emphasize the word "overhead."[29] *See, e.g.*, Pl. App'x at 59, 67, 75 and 97. While "[t]he use of identical dominant words does not automatically mean that two marks are similar," *Luigino's*, 170 F.3d at 830, "exact similitude of the two marks is not required for a finding of likelihood of confusion." *Iowa Paint Mfg. Co., Inc. v. Hirshfield's Paint Mfg., Inc.*, 296 F. Supp. 2d 983, 993 (S.D. Iowa 2003). At minimum, the Hicklins' emphasis on the term "overhead" creates a similarity between the parties' advertisements. *See id.* at 994 ("Where the dominant portions of marks [are] the same, confusion is more likely."). This is particularly true because the parties' goods and services are virtually the same. *See SquirtCo v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1980) ("Where the products are closely related, less similarity in the trademark is necessary to support a finding of infringement.").

The Hicklins argue that the marks are dissimilar because, while Plaintiff uses its "red ribbon" mark, the Hicklins do not feature the term "overhead" in a red ribbon logo or use the same font or size as the Overhead Door company logo. Hicklins' Brief at 14. The Hicklins also note that their advertisements feature their own logos, either for A-1 American Garage Door Repair or Advanced Garage Door Repair. The court agrees that these differences make the parties' advertisements more visually distinct. On the other hand, the Hicklins acknowledge that they have, at times, featured the term "overhead" in

---

[29] While both parties' advertisements emphasize the word "overhead," they generally do so differently. The Hicklins' tend to feature the term as the largest item in the advertisement. *See* Pl. App'x at 75. Plaintiff, on the other hand, emphasizes the term through repetition. *See id.* (featuring term "overhead" five times).

red font, which may tend to make some of their advertisements more similar to Plaintiff's use of the red ribbon. The court also discounts the emphasis the Hicklins' place on their use of company logos. While the use of a company name or house mark may decrease the likelihood of confusion, *Iowa Paint*, 296 F. Supp. 2d at 994, these features of the Hicklins' advertisements are uniformly drowned out by the presence of and emphasis on the term "overhead." *See, e.g.,* Pl. App'x at 67, 72 and 97 (depicting advertisements that, despite including "Advanced Garage Door Repair" logo, feature the term "overhead" as the largest aspect of advertisement).

Perhaps most importantly, in considering the parties' marks, the court "'must attempt to recreate the conditions in which buying decisions are made, and . . . what a reasonable purchaser in market conditions would do.'" *Iowa Paint*, 296 F. Supp. 2d at 993 (quoting *Calvin Klein Cosmetics Corp. v. Lenox Labs, Inc.*, 815 F.2d 500, 504 (8th Cir. 1987)). In other words, "caution should be exercised to avoid putting too much stock in a subjective inspection done in-chambers that is devoid of market characteristics." *Calvin Klein Cosmetics Corp.*, 815 F.2d at 504.

The Hicklins' argument that the parties' advertisements are "very different" when "presented side by side," Hicklins' Brief at 14, ignores the requirement that any potential similarity between the parties' marks should be viewed in light of how the typical consumer encounters the advertisements. *See Iowa Paint*, 296 F. Supp. 2d at 993 (noting that a side-by-side comparison is not the appropriate test, particularly where the consuming public will never have the opportunity for such a comparison). The customer testimony Plaintiff offers suggests that customers may seldom encounter the parties' advertisements in a side-by-side fashion.[30] *See, e.g.,* Pl. App'x at 145 (testimony of Jeffrey DeFrance

---

[30] The court notes that, in some instances, the parties' advertisements appear on the same page of the telephone book. *See* Hicklins' App'x at 202. However, nothing suggests this is always the case. *See id.* at 195.

that he called after "glanc[ing] at" the telephone book and seeing advertisement on the bottom). Thus, while there are several distinctions between the parties' advertisements when considered side by side, the court finds they are entitled to less weight due to the circumstances in which the consuming public encounters them. Considering the relatedness of the parties' products and services, as well as the circumstances in which a typical consumer encounters their advertisements, the court finds that this factor weighs in favor of a likelihood of confusion.

### iii.    *Competitive proximity of the parties' products*

The parties both sell garage door products and repair services and directly compete in the same geographic region. *See Duluth News-Tribune*, 84 F.3d at 1097 (declining to analyze this factor where "[n]either party contests that both papers provide regional and local news coverage and that they directly compete in the Iron Range"). Accordingly, this factor weighs in favor of a likelihood of confusion.

### iv.    *The Hicklins' intent to confuse*

To establish a passing off claim under § 43(a), Plaintiff need not prove that the Hicklins intended to confuse or deceive consumers. *Blinded Veterans Ass'n*, 872 F.2d at 1045. However, an intent to deceive "retains potency" and "when present, it is probative of a likelihood of confusion." *Id*. Here, Plaintiff offers evidence from which a jury could reasonably find that the Hicklins intended to confuse consumers into thinking that their products and services were those of Plaintiff. Accordingly, this factor weighs in favor of a likelihood of confusion.

The Hicklins admittedly placed numerous advertisements in telephone directories which feature the term "overhead" as the most prominent part of the advertisement. Randy Hicklin created several of these advertisements and acknowledges that he intentionally emphasized the term "overhead." With respect to an advertisement in the April 2010 Dex directory, Randy Hicklin acknowledges that he told a Dex representative

to make the term "overhead" "as bold as possible." Pl. App'x at 47. Similarly, for the Iowa City Dex directory dated November 2009, Randy Hicklin created a mock up of the advertisement and later wrote in the margin of the advertisement that the term "overhead" should be "MUCH LARGER & BOLD STRETCHED OUT." *Id.* at 105.

The Hicklins' emphasis of the term "overhead" in their advertisements could support a finding that they were attempting to cause purchasers to believe their products and services were those of Plaintiff. *See Metric*, 635 F.2d at 714 (noting that the defendant's use of the "significant word" in the plaintiff's tradename tended to cause purchasers to believe the products were being purchased from the plaintiff); *Genesee Brewing*, 124 F.3d at 151 (holding that evidence could support a likelihood of confusion, in part because the defendant had "chosen to emphasize the words 'Honey Brown' on its label, rather than the words 'Red River Valley' or 'Honey Brown Ale'). Like the defendants in *Metric* and *Genesee Brewing*, the Hicklins chose to emphasize the term "overhead" over any other aspect of their advertisements, including their own d/b/a names, A-1 American Garage Door Repair or Advanced Garage Door Repair.

Plaintiff also points to testimony of two instances in which a representative of the Hicklins' either misrepresented to the customer that they had, in fact, contacted Plaintiff, or implied as much by remaining silent. Jeffrey DeFrance testified that when he mistakenly called the telephone number on one of the Hicklins' advertisements for Advanced Garage DoorRepair, he "asked twice, is this Overhead Door Company of Cedar Rapids and Iowa City?" Pl. App'x at 145. DeFrance testified that the woman who answered said yes and that, "if she'd have said, we're Advanced Overhead Door, we're not Overhead Door, then I would have just . . . . Then I would have called Overhead Door." *Id.* Similarly, Shari Saari testified that the Hicklins' technician said nothing after Saari pointed to an Overhead Door sticker on her garage and said, "you have been here before." *Id.* at 137.

The court finds that the Hicklins' decision to emphasize the term "overhead" more than any other feature—including their own logos—in many of their advertisements, coupled with evidence that they may have misrepresented their business as that of Plaintiff, could support a finding that they intended to confuse customers as to the source of their products or services. Accordingly, this factor weighs in favor of a likelihood of confusion.

### v. *Evidence of actual confusion*

Several of Plaintiff's customers testified that they called the Hicklins' businesses when, in fact, they were trying to contact Plaintiff.[31] The Hicklins argue that the "mistakes" of these customers are attributable to their inattentiveness rather than actual confusion. Hicklins' Br. at 15. The court agrees that some customers acknowledged they should have exercised more care when searching the telephone book, such as looking for the "red ribbon" logo or opening the telephone book to the Yellow Pages, rather than relying on an advertisement on the cover or bottom.

To the extent that Plaintiff's evidence of customer confusion is attributable to the customers' inattentiveness, these instances do not support a likelihood of confusion. *See Duluth News-Tribune*, 84 F.3d at 1098 (discounting instances of misdirected mail and phone calls because such evidence was "de minimis" and reflected "inattentiveness on the part of the caller or sender rather than actual confusion"). However, "actual confusion is not essential" to finding a likelihood of confusion. *SquirtCo.*, 628 F.2d at 1091; *see also Aveda Corp. v. Evita Mktg.,* Inc., 706 F. Supp. 1419, 1430 (D. Minn. 1989) ("It is the likelihood of confusion that serves as the test for infringement, not actual confusion. The plaintiff is not required to prove any instances of actual confusion."). Thus, while Plaintiff has not provided evidence of widespread customer confusion, and several of its cited

---

[31] Greg Allen, Jack McArtor, Shari Saari, Jeffrey DeFrance, Linda Norton and Karen Guse all testified that, although they were trying to reach Plaintiff, they contacted one of the Hicklins' businesses.

examples may be explained by customer carelessness, these facts would not preclude a finding that a likelihood of confusion exists.

### vi. Potential customers' degree of care

The Hicklins offer no argument or evidence bearing on this consideration. Plaintiff, however, argues that it supports a likelihood of confusion because "[s]everal customers testified that they spent only a few minutes glancing at the phone book before being duped by the Hicklins' advertising." Resistance at 17. "Consumers typically exercise little care in the selection of inexpensive items that may be purchased on impulse." *Gateway, Inc. v. Companion Prods., Inc.*, 384 F.3d 503, 510 (8th Cir. 2004). The record does not reflect the price of the parties' goods, but one could infer that the purchase of a residential garage door is not the prototypical "impulse buy" and likely costs more than, say, a can of "Beer Nuts." *See Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920, 926-27 (10th Cir. 1986) (holding that customers would exercise little care in selecting "inexpensive snack foods" that are "not generally on a shopper's grocery list"). The significance and/or price of a garage door itself indicates that customers are more likely to exercise a higher degree of care.

However, the parties also provide garage door repair services, and Plaintiff points to several instances in which its customers quickly scanned the telephone book in search of Plaintiff's business before making a call. In some instances, Plaintiff's customers did not even open the telephone book after noticing an advertisement or coupon on the cover or bottom of the directory. This may be the most likely response in the event of an unexpected garage door malfunction. For example, customer Jeffrey DeFrance testified he simply "glanced at" the telephone book on top of his refrigerator before calling because his garage door had broken and he had "no way to lock [his] house . . . ." Pl. App'x at 145. Similarly, Linda Norton testified that she spent "[v]ery little" time looking at the telephone book before making a call and she "did not look inside the phonebook" after

noticing a coupon on the cover of the telephone book. *Id.* at 153. Karen Guse testified that she spent between 30 seconds and one minute before dialing the number listed on the bottom of the telephone book because she "just basically saw it, and it said 'overhead.'" *Id.* at 162. This testimony, although somewhat limited, shows that the degree of care reasonably expected of Plaintiff's potential customers may contribute to a likelihood of confusion.

The Hicklins argue, albeit in reference to the issue of actual confusion, that these individuals' mistakes "can be attributed to inattentiveness on the part of the caller rather than actual confusion." Hicklins' Brief at 15. However, the issue here is not what a perfectly attentive customer would do, but what amount of care can reasonably be expected of potential customers. *See Luigino's*, 170 F.3d at 831 ("[W]e must stand in the shoes of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods.") (quotation marks omitted). The Hicklins provide no evidence suggesting that the ordinary customer would exercise any more care than that displayed by the customers Plaintiff has identified. Accordingly, the court finds that this factor weighs in favor of a likelihood of confusion.

### d.    *Conclusion*

For the foregoing reasons, the court finds that there are genuine issues of material fact with respect to both secondary meaning and a likelihood of confusion. Because several of the factors discussed above weigh in Plaintiff's favor, summary judgment on this issue is inappropriate. *See Eniva Corp. v. Global Water Solutions, Inc.*, 440 F. Supp. 2d 1042, 1052 (D. Minn. 2006) (denying defendant's summary judgment motion on infringement claim because "three of the likelihood of confusion factors favor" the plaintiff). Accordingly, the court shall deny the Motion for Summary Judgment to the extent it seeks dismissal of Plaintiff's passing off claim under § 43(a) of the Lanham Act.

## 2. *False advertising*

Plaintiff asserts that the Hicklins have engaged in false advertising by: (1) "claiming to have 'certified' technicians" and (2) "misleading consumers that the Hicklins are based locally by using a phone number with a (319) area code that is answered in Sioux City." Resistance at 19. To establish a claim under the false or deceptive advertising prong of the Lanham Act, Plaintiff must prove:

> (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products.

*United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1180 (8th Cir. 1998).

> The false statement necessary to establish a Lanham Act violation generally falls into one of two categories: (1) commercial claims that are literally false as a factual matter; and (2) claims that may be literally true or ambiguous but which implicitly convey a false impression, are misleading in context, or likely to deceive consumers.

*Id.*

Plaintiff contends that the Hicklins' claim of "certified" technicians is "per se false" because the only certification came from Randy Hicklin. Resistance at 19. "If a plaintiff proves that a challenged claim is literally false, a court may grant relief without considering whether the buying public was actually misled; actual consumer confusion need not be proved." *United Indus.*, 140 F.3d at 1180. The court disagrees with Plaintiff that the Hicklins' claim of "certified" technicians is literally false simply because Randy Hicklin provided the certification. Plaintiff apparently takes issue with the fact that the

Hicklins' technicians were not certified by an "independent entity" or an "objective third party." Pl. Statement of Facts at ¶ 77. However, Plaintiff offers no evidence that the Hicklins have ever claimed—on an advertisement, shirt or otherwise—that their technicians were certified by anyone in particular. The technicians were, in fact, certified—Randy Hicklin certified them. Therefore, the court finds that the Hicklins' claim of "certified" technicians is not literally false.[32]

Although the Hicklins' claim regarding "certified" technicians is not literally false, literally true or ambiguous claims are actionable if they "nevertheless have a tendency to mislead or deceive the consumer . . . ." *United Indus.*, 140 F.3d at 1182. Even assuming, without deciding, that the Hicklins' statements regarding certification have a tendency to mislead or deceive consumers, this portion of Plaintiff's claim fails. "Where a claim is not literally false but is misleading in context, proof that the advertising actually conveyed the implied message and thereby deceived a significant portion of the recipients becomes critical." *Id.* Here, Plaintiff offers no evidence to support a finding that any consumers were deceived by the Hicklins' claim of "certified" technicians. Accordingly, the court shall grant summary judgment in the Hicklins' favor with respect to this portion of Plaintiff's false advertising claim.

The Hicklins are also entitled to summary judgment on Plaintiff's false advertising claim based upon the Hicklins' use of a (319) area code. Plaintiff does not argue that there

---

[32] Plaintiff also takes issue with the Hicklins' "Advanced Garage Door Certified Checklist" ("Checklist"). Pl. App'x at 184. Specifically, Plaintiff argues that "the only written description of the meaning of the certification was created after [Plaintiff] filed this lawsuit." Resistance at 19-20. Regardless of when the Checklist was reduced to writing, Randy Hicklin testified that he has trained his technicians based on the same criteria "since 2002." Pl. App'x at 40. Further, Lance Cross testified that Randy Hicklin trained and certified him when he was hired. In any event, Plaintiff does not dispute that Randy Hicklin actually engaged in a training and certification process with the Hicklins' technicians. Accordingly, the court fails to see the materiality of when the Checklist was formally put on paper.

is anything literally false about the Hicklins' use of a (319) telephone number. For example, Plaintiff does not contend that the Hicklins affirmatively represent to the public that calls to its (319) number are answered within that area code. Accordingly, Plaintiff must offer proof that the Hicklins' claims actually "deceived a significant portion of the recipients . . . . " *Id.* As with the Hicklins' "certified technicians" claims, Plaintiff offers no evidence that a single recipient of the Hicklins' advertising, much less a "significant" portion, was somehow deceived by the Hicklins' use of a (319) area code. *See id.* (discussing importance of evidence of consumer impact). Accordingly, the court finds that summary judgment is appropriate with respect to Plaintiff's false advertising claim based upon the Hicklins' use of a (319) area code.[33]

### C. *Iowa Code Section 548.113*

Plaintiff claims that the Hicklins' conduct "has diluted the distinctive qualities" of the term "overhead" and "will continue to cause dilution unless enjoined." Second Amended Complaint at ¶ 40. Iowa Code section 548.113 ("Section 548.113") allows the owner of a "famous" mark to obtain injunctive relief against another's use of the mark if that use "causes dilution of the distinctive quality of the owner's mark . . . ." Iowa Code § 548.113. Although relief under the statute is generally limited to an injunction, a court may award treble damages and attorneys' fees if the defendant "willfully intended to trade on the owner's reputation or to cause dilution of the owner's mark." *Id.*

The Hicklins analogize Plaintiff's Section 548.113 claim to a trademark dilution claim under the Lanham Act, and contend that summary judgment is appropriate because Plaintiff cannot establish that its purported mark "overhead" is "famous." The Hicklins

---

[33] The court notes that this aspect of Plaintiff's false advertising claim would fail on other grounds as well. For example, Plaintiff sets forth no evidence or argument on the materiality of the Hicklins' use of a (319) area code. That is, that such use has or would influence the consumers' purchasing decision. *United Indus. Corp.*, 140 F.3d at 1180.

also claim that Plaintiffs cannot establish any actual dilution.

The parties cite no case applying Section 548.113, and the court has found none. However, the statute—and Plaintiff's claim thereunder—is clearly directed at trademark dilution. "Dilution occurs when consumers associate a famous mark with a new product." *Luigino's*, 170 F.3d at 833. "Normally, the doctrine applies in cases where similar marks are used on dissimilar goods." *Id.* (quoting *Pro-Phy-Lac-Tic Brush Co. v. Jordan Marsh Co.*, 165 F.2d 549, 553 (1st Cir. 1948)). Therefore, courts typically hold that a dilution claim fails where the parties are competitors who sell similar goods or services. *See Sensient Tech. Corp. v. SensoryEffects Flavor Co.*, 613 F.3d 754, 771 n.4 (8th Cir. 2010) (Colloton, J., concurring in the judgment in part) (concurring in the dismissal of a claim under a Missouri anti-dilution statute "because this is a dispute between competitors who sell similar goods"); *Luigino's*, 170 F.3d at 833 (affirming summary judgment in favor of the defendant on plaintiff's dilution claim where both parties marketed low-fat frozen entrees); *see also* McCarthy 24:74 (opining that "antidilution law is out of its proper place in a case of competing parties"). In light of the fact that the parties are competitors who sell similar goods and services, Plaintiff's state law dilution claim fails.

Furthermore, the term "overhead" has not achieved the requisite "famous" status for protection under the statute. *See WSM, Inc.*, 724 F.2d at 1332 ("Since 'opry' is not an arbitrary, coined or fanciful term, it is not a distinctive mark entitled to protection under the Missouri anti-dilution statute."); McCarthy § 24:87 (noting that, for purposes of Lanham Act dilution claims, "when a mark is found to be too weak to be infringed by the traditional likely confusion test, then it is necessarily too weak to be diluted"). Accordingly, the court finds that summary judgment is appropriate on Plaintiff's anti-dilution claim under Section 548.113.

## VIII. CONCLUSION

In light of the foregoing, it is **HEREBY ORDERED THAT**:

(1)     Plaintiff's Motion to Strike (docket no. 70) is **DENIED IN PART** and **DENIED AS MOOT IN PART**;

(2)     The Hicklins' Motion to Strike (docket no. 90) is **DENIED**;

(3)     The Hicklins' Objections and Appeal (docket no. 98) are **DENIED AS MOOT**; and

(4)     The Hicklins' Motion for Summary Judgment (docket no. 68) is **GRANTED IN PART** and **DENIED IN PART** as follows:

    (a)     The Hicklins' Motion for Summary Judgment is **GRANTED** with respect to Count I, Count II, Count IV and Count V of the Second Amended Complaint;

    (b)     The Hicklins' Motion for Summary Judgment is **GRANTED** with respect to Count III of the Second Amended Complaint to the extent such count alleges service mark infringement in violation of Lanham Act § 43(a); and

    (c)     The Hicklins' Motion for Summary Judgment is **DENIED** with respect to Count III of the Second Amended Complaint to the extent such count alleges passing off in violation of Lanham Act § 43(a).

**IT IS SO ORDERED.**

**DATED** this 2nd day of December, 2010.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA